**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Joseph Anthony Carpenter, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **RE MOTION TO DISMISS** |
| Petitioner, | ) | **§ 2254 PETITION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Colby Braun, Warden, North Dakota State | ) | |
| Penitentiary, | ) | |
| | ) | Case No. 1:13-cv-153 |
| Respondent. | ) | |

Petitioner Joseph Anthony Carpenter ("Carpenter") is an inmate at the North Dakota State

Penitentiary. He initiated the above-entitled action on December 13, 2013, with the submission of

a "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody." He

later filed an amended petition. On August 27, 2014, respondent filed a motion to dismiss his

amended petition, which has been referred to the undersigned for preliminary consideration. For

the reasons set forth below, the undersigned recommends that respondent's motion be granted and

that Carpenter's habeas petitions be dismissed.

I.      **BACKGROUND**

A.      **Carpenter's conviction and sentencing as a habitual offender**

The chain of events culminating in Carpenter's conviction and sentencing in state district

court were summarized as follows by the North Dakota Supreme Court in State v. Carpenter:

> [¶2] Carpenter and Jeffrey Hart lived in separate vehicles parked near each
> other in a parking lot. Carpenter and Hart were involved in an altercation. Several
> hours later, Hart awoke to find his vehicle in flames. Hart had burns on his hands,
> arms, and legs. His vehicle was destroyed, along with his possessions inside.
> Investigators determined the fire was set intentionally . . . .

1

2011 ND 20, ¶ 2, 793 N.W. 2d 765 ("Carpenter I").

Carpenter was subsequently charged with endangerment by fire or explosion by placing another person in danger of death under circumstances manifesting an extreme indifference to the value of life - a Class B felony for which the maximum jail term is ten years. He also was charged alternatively with endangerment by fire or explosion by causing damage to property in excess of two thousand dollars–a Class C felony for which the maximum jail terms is five years. Id. at ¶¶ 9-12; N.D.C.C. § 12.1-32-01(3)-(4).

On the day before trial, the prosecution filed a "Notice of Habitual Offender" pursuant to N.D.C.C. § 12.1-32-09. This doubled Carpenter's exposure in terms of the *maximum* jail sentence that could be imposed if he was found to be a habitual offender, *i.e.*, twenty years for the more serious Class B felony offense and ten years for the Class C felony offense. However, it did not alter the *minimum* term for either offense, which was no jail time.[1]

Carpenter, who was in custody when the habitual offender notice was filed, did not learn about the notice until the next morning just prior to the start of the trial during a brief pretrial conference, at which his counsel objected to the one-day notice as being untimely. Although N.D.C.C. § 12.1-32-09 required that the notice be filed a reasonable time prior to trial, the trial court overruled counsel's objection, concluding that, since the prosecutor had earlier advised him the notice might be filed, the filing was timely under the circumstances. The court's conclusion that Carpenter's counsel had been made aware by the prosecutor of the possibility of the habitual offender notice filing was based on the following exchange that took place when counsel objected

---

[1] Under N.D.C.C. § 12.1-32-09, the court was not required to impose an enhanced sentence if Carpenter was found to have been a habitual offender. As the district court noted at the time of the resentencing, the court could impose zero to ten years if Carpenter was not found to be a habitual offender and zero to twenty years if he was a habitual offender. (Docket No. 27, Ex. 23, p. 15).

to the late notice:

> MR. FINCK:            * * * *
> What I would want to put on the record, I guess, is it does say that notice must be - - reasonable notice must given before trial.
> And, although Mr. Erickson did mention it in plea negotiations, notice of the filing was not given until yesterday.  So we would object at this point that there was not reasonable notice under the statute.
>
> THE COURT:  All right:  And, well, I'll find reasonable notice.  You knew about it.  The opportunity.  And I have received all of the judgments.

(Docket. No. 27, Ex. 22, p. 26).

Following the trial at which Carpenter was found guilty of both charges and determined to be a habitual offender, he was sentenced on the greater charge to a fifteen-year term of imprisonment.  (Docket No. 27, Ex. 17, p.1).  This was five years more than the maximum he could have received without the habitual offender determination.  Also, as discussed in more detail later, it was ten years more than the last plea offer made by the State in terms of the amount of time to serve, which Carpenter rejected prior to the filing of the habitual offender notice.

**B.      Reversal of Carpenter's sentence and resentencing as a habitual offender**

On direct appeal, the North Dakota Supreme Court addressed Carpenter's claim that the State did not provide reasonable notice of its intention to seek a sentence enhancement.  In addressing the claim, the court made reference to the district court's conclusion that the notice was timely because the prosecutor had earlier advised the notice might be filed, stating:

> The State filed notice of its intention to seek a habitual offender sentence enhancement one day before trial. Carpenter's trial counsel suggested Carpenter was aware the State might seek to enhance his sentence: "And, although [the State] did mention it in plea negotiations, notice of the filing was not given until yesterday. So we would just object at this point that there was not reasonable notice under the statute." The trial court responded, "And, well, I'll find reasonable notice. You knew about it. The opportunity. And I have received all of the judgments."

<u>Carpenter I</u>, 2011 ND 20 at ¶ 24. Nevertheless, the court went on to conclude that the notice was not timely and that Carpenter suffered prejudice - essentially because he did not have adequate time to prepare for and contest whether his prior Minnesota convictions qualified him to be a habitual offender. But, rather than denying the State the ability to seek a habitual offender designation, the Court concluded the appropriate remedy was for Carpenter to be resentenced following the State providing reasonable notice. <u>Carpenter I</u>, 2011 ND 20 at ¶ 20.

On remand, the trial court again determined that Carpenter was a habitual offender and resentenced him over his objections to the same fifteen-year term of imprisonment that the court had imposed originally. (Docket No. 27, Ex. 17, p. 2). One of the objections that Carpenter made at the time of resentencing was that he would have taken the State's final plea offer had he known in advance of trial of its intent to seek a habitual offender sentencing enhancement. The trial judge refused to consider this argument, however, stating it was a matter for postconviction relief. (Docket No. 27, Ex. 23, pp. 11-15).

Carpenter again appealed and his resentence was summarily affirmed. <u>State v. Carpenter</u>, 2012 ND 46, ¶ 1, 809 N.W.2d 833 ("<u>Carpenter II</u>").

**C.      <u>State petition for postconviction relief and hearing</u>**

Carpenter next filed a state petition for postconviction relief alleging (among other claims not pursued here) that his attorney had been ineffective in not advising him about the habitual offender law, not telling him about the filing until the morning of the trial, and telling him at that time the State's prior plea offer was off the table without any effort being made to determine whether that was in fact the case. (Docket No. 27, Ex. 15). The state district court conducted a hearing on the petition at which both Carpenter and his trial counsel gave testimony. (Docket No.

27, Ex. 16 (hearing transcript)).

## 1. Carpenter's testimony

Carpenter testified at the postconviction hearing about his recollection of the plea negotiations, whether his trial counsel had discussed with him the possibility of the state seeking a habitual offender designation, and his request on the morning of the trial whether he could still plead given the filing of the habitual offender notice the day prior. In reviewing the testimony, it is helpful to understand that Carpenter was first represented by attorney Lori Weisz, who withdrew following the preliminary hearing because of a conflict. She was replaced by attorney Travis Finck, who is the subject of Carpenter's claims of ineffective assistance.

Carpenter testified on direct examination in relevant part as follows:

Q      And during the course of his representation, were you aware of any plea negotiations that were taking part on your behalf?

A      Yeah. We discussed the first - - the first plea. Well, the only one came to me and said that Mr. Erickson [the prosecuting attorney] had offered eight years, three suspended and do five.
I asked Mr. Finck if he would counter that with five years suspended and do 18 months. And he came back to me and said that Mr. Erickson wasn't going to go for that.

Q      Okay. Now, so you rejected that plea offer. Is that correct?

A      I - - yeah, that plea offer at that time.

Q      Okay. During the course of any of these plea negotiations, was the issue of habitual offender ever brought to your attention?

A      Not in - - not in a formal manner. One time Mr. Erickson had leaned over, said to my prior attorney and mentioned it to her off - - not on the record, but prior. He leaned over, said, we could, you know, we could get him for habitual.

* * * *

Q      Now, how exactly did this habitual offender come into play in terms

of the chronological order of your trial?

    A      We - - the trial was set for, I believe it was the 9th of March 2010. The morning of the trial, Mr. Finck and Mr. Erickson had some issues about some things they wanted to bring into Court, so we went into the judge's chambers. We went into the judge's chambers, Mr. Finck leaned over, told me Mr. Erickson filed habitual offender on you yesterday.

    Q      And that was?

    A      Being the Monday, so that was the eighth. That was Monday the eighth. That was the first time I heard about the habitual.

    Q      And so that was the first time that you heard about the habitual offender?

    A      Yes, sir.

    Q      Now, did you ask Mr. Finck about the prior plea offer, that is, the five years, eight years with three suspended?

    A      I don't think I went into that specifically. I asked him, well, what about pleading out to this right now this morning? And his response was that the plea agreement was off the table.

    Q      It was no longer effective?

    A      No longer effective that morning.

    Q      So based upon the information that you had at that time, you proceeded to trial?

    A      Yes, sir.

    Q      Now, did you ever have any discussions with Mr. Finck regarding habitual offender?

    A      No, not that he was going to file on me. Never. I never. Had I known what the habitual offender - - I come from Minnesota and all my dealings have been with the Minnesota courts, and it was years ago. I haven't been in front of a Court in many years as far as prison sentence. And over there, the habitual, I knew what the habitual offender meant. I didn't know that morning of the trial what the habitual offender meant in McLean County. There was only the two Class C felonies because I did have a checkered past. I did have felonies in my past.

\* \* \* \*

Q     And then you said that you had an understanding of habitual offender statutes in Minnesota.  And apparently, this did not - - this was not the same as in North Dakota.  Is that correct?

A     Yes, sir.

Q     What was the difference, at least your understanding of it ?

Q     Well, I didn't have no understanding what the difference was.  When I heard about it that morning, and had I known habitual offender in North Dakota was two Class C Felonies, I sure would have - - I sure wouldn't have gone up and gone to trial because the face - - I was actually facing 20 years and I got 15 out of it.  Minnesota is three same or similar, and I had been threatened over there with it back in the '70s and '80s when I was - - I was young, and I admit I was doing some - - I was a drug addict at that time.

\* \* \* \*

Q     And when the plea offer came Mr. Erickson for the eight years with three suspended, were you thinking about habitual offender?

A     No.  No, I wasn't.  I was thinking about actually, there was a discrepancy there, too, because Mr. Finck - - and I can't remember the other name of the other attorney - - they weren't sure at the start of this thing if it was going to be a Class C or Class B.  Actually, when we went to trial, the Jury was the one that chose the Class B Felony with the Endangerment by Fire or Explosion over $2,000 - worth of damage or endangerment by fire or explosion, whatever, when I got - - there was two, and they chose the Class B.  And it was up near all during that time if I was getting, you know, a Class B or Class C Felony.

\* \* \* \* And we actually, me and Travis Finck actually, when we were talking about the charge of endangerment by fire and explosion, he actually in my presence called when we were talking at the McLean County Jail, he called the penitentiary and asked them specifically, because we're, you know I was thinking about taking the deal and that was even before the habitual in there.  He called to find out if it was 85 percent.  If it would have been 85 percent, I would have pled out to it right there.  I would have said, yeah, let's take the eight years, three suspended.  And we called and they said it wasn't 85 percent.

Q     Now, one of the - - one of your claims in this, in you claim for post-conviction relief and ineffective assistance of counsel, is that you do not feel that you were adequately advised or fully advised in terms of what the sentencing alternatives

could potentially be in your case.  Is that correct?

A    Yes, sir.

Q    According to your recollection, up until the morning of the trial, you did not believe that habitual offender was on the table?

A    No, sir.

Q    You were aware, however, that there had been some talk at least with Lori Weisz previously about habitual offender?

A    She never even mentioned it to me.  It was just in passing with Mr. Erickson.  There was never any talk between me and Lori Weisz about it.  She never, ever.  I almost - - when I looked at Mr. Erickson, I though it was he was just joking.  I mean, I took it as nothing that day.  And Lori Weisz put her arms like it was nothing, and that's the only thing that I had heard of that day.

Q    So in terms of your understanding of the plea proposal that had been made to you, habitual offender was never discussed?

A    No.

Q    Not once?

A    No, not to me.

Q    Okay.  And did you ever have occasion to talk to Mr. Finck after the morning of the trial, pretrial conference about what the impact of habitual offender would be?

A    No.  We were concentrating on the trial and he had a defense going at that time and we were going to stick to that.

* * * *

Q.    Do you believe - - I'm going to get back to your ineffective assistance of counsel claim.  Do you believe that if you had been - - if the terms of a plea agreement, including the potential sentence for habitual offender had been discussed with you, that you would have taken the plea agreement that Mr. Erickson offered?

A    Yes, sir.  For one thing, if there would have been on the table - - we called the state penitentiary, asked them about the habitual, if that was 85 percent, also.  I would have found out that it's not 85 percent, but it's considered - - they consider it over there almost the same.  I have gone in there on a 15 year sentence.

When I got there, they gave me a parole hearing 2014. When they found out it wasn't just endangerment by fire and explosion, they changed the parole hearing. I don't come up to even see the parole board until 2019, 10 years into my sentence. So they're considering me almost like a habitual.

> Q        And do you believe that if you had been fully informed of the sentence potential, sentencing consequences, that this would have made a difference in your decision-making?

> A        Yes, sir.

(Docket. No. 27, Ex. 16, pp. 6-17).

Later, the following exchange took place between Carpenter and the state postconviction judge:

BY THE COURT:

> Q        You told somebody, whether it was your attorney or Mr. Erickson, that you know what habitual offender was in Minnesota from your prior contacts with the court system?

> A        Yes.

> Q        Okay. And then you testified that your first attorney, who would have been up through the preliminary hearing, you heard the words "habitual offender" from Mr. Erickson talking to your attorney?

> A        He leaned over, said it actually later.

> Q        Right.

> A        Yeah.

> Q        And that didn't spook you, made you nervous, make you worry about what could happen with what's habitual offender here in North Dakota?

> A        No, sir, I didn't, because I - - -

> Q        Didn't ask your attorney about that?

> A        No. I presumed habitual offender is the same thing in Minnesota, and that's three simple or similars. I never committed an arson or endangerment by fire

and explosion.  All of mine were theft-related crimes in Minnesota.

Q    Okay.  But didn't ask that of your first attorney, what is habitual offender?

A    No.

Q    Did you ask?

A    No.

Q    Okay. Then Mr. Finck got involved.  Do you recall ever asking Mr. Finck about what's habitual offender in North Dakota?

A    No, sir.

Q    Basically, just went, I'm not worried about it because it doesn't match Minnesota?

A    Because it was never brought up.  The question was never brought up with him.

Q    "With him".  Who is "him"?

A    With Mr. Finck.

Q    Okay.  You never brought it up?

A    No.

(Id. at pp. 32-34).

### 2.    Counsel's testimony

Carpenter next called Finck to testify.  Finck began his testimony by stating he had some difficulty recalling the details, given the fact the plea negotiations had taken place more than two years prior, and that he would have to rely more upon the few notes he had than his recollection. (Id. at p. 36).  Counsel then testified about the plea negotiations that had taken place as follows:

Q    And would you kindly proceed then.

A       My recollection is, is when we first got started in this - - and again, Mr. Carpenter had represented or had been represented by Ms. Weisz up until the time of after the preliminary hearing.  * * * *

Immediately upon meeting Mr. Carpenter, we began looking at the case in the whole.  And in that, we also began plea negotiations.

* * * *

I received a letter from Mr. Carpenter saying there's no way he could do more than ten years because he had a family at home.  He just couldn't handle doing more than ten years.  And if I could get a five year straight time, waive fees, that he would plead guilty to that.  So I had approached Mr. Erickson and had kept trying to get a sentence of five years.  My notes reflect that on February 25th I would have had a phone conversation with Mr. Erickson, which would have been a Friday, as I was preparing for trial, where I indicated that he would go to eight years with three suspended, but he wanted a period of probation afterwards.  So we did get the five years to serve, but he wanted a period of probation.

My notes reflect that I called Mr. Carpenter at the detention center.  I don't remember the exact nature of that conversation.  All I can note is that by Tuesday of the next week I had filed my jury instructions.  So to me, that indicated that Mr. Carpenter did not want to accept that deal.

I don't recall specific discussions regarding habitual offender.  I know that in - - and I believe I said this in the transcript at the morning hearing, that there had always been off in the distance, as Mr. Carpenter kind of said, and I learned of it from Mr. Carpenter because I believe at one point he did say something about, you know, there was a reference made.  But I had not received notice that Mr. Erickson was going to receive or file for habitual offender.  I have been doing this long enough, I guess, of the state's attorneys telling me they're going to do all kinds of different things.  And until I have that it's been filed, and Mr. Erickson is usually very prompt about filing those if he's going to file them.

So Mr. Carpenter is right, we did not have an in-depth discussion about what habitual offender is, what they need to show, and ramifications.  There may have been some off-the cuff remarks about it, but I don't recall ever specifically sitting down, going through everything, because we did spend quite a bit of time together preparing.

(Id. at pp. 37-38).   When asked what had happened to the prosecution's last plea offer, counsel

testified:

A       It's my understanding that the plea offer would have been on for the eight with three suspended until the time that we showed up for trial that morning, because that was a Friday and trial was, I believe the next week.  I don't know that there was ever any official correspondence, I'm revoking this offer, but it's standard.

And perhaps Mr. Erickson said it, but I mean, if we have to show up and all of the witnesses are there the morning of the trial. We're not going to do a change of plea kind of thing. So it would have been revoked once we, I guess, decided that that's the offer, we're going to trial. I did not re-approach and say, hey, is this still on the table on the morning of trial, as Mr. Carpenter stated, where we were having this argument about how we were going to deal with the habitual offender. Because I objected to the notice. We, at that point, were focused on the actual trial and what we developed, a strategy.

(Id. at p. 40).

Counsel then gave the following testimony as to what occurred on the morning of the trial after the State had filed the habitual offender notice the day prior:

Q       Okay. All right. As of the morning of the 9th when the habitual offender was now on the table, did you have a discussion with Mr. Carpenter about what his alternatives were at that point in time?

A       Not on the morning of the 9th, no. Because I'd driven up from Bismarck. They brought him over from the jail. We were in the basement of the American Legion. They had brought him in. We met in the kitchen, I believed served as judge's chambers. We had a brief discussion about it.
By that time the Jury panel was already there. We went out, started voir dire. I don't recall if we had a break in between there. It was - - that's just the way it went down.

* * * *

Q       And so now as of the morning of March 9th, you got the habitual offender in front of you. You're focused in on going to trial. You believe the plea offer was off the table. Is that correct?

A       When we got there the morning of trial, I guess I just - - I didn't even ask Mr. Erickson. I just figured at that point we already had a Jury there, that we were trying the case. So I had assumed, at the risk of taking an assumption, I assumed it was no longer valid.

Q       So you did not approach Mr. Erickson at that point saying, hey, is that offer still on the table? You convinced us to take it.

A       No, because I had - - again, I had taken the exact same offer to Mr. Carpenter about a week prior and he had said "no."

Q    But the difference a week prior was that there was no habitual offender that you were aware of?

A.    There was no notice for habitual offender.  That's correct.

Q    And was this sufficient change in circumstances where you should have gone back, in your professional opinion, and approached Mr. Erickson at that point in time?

A    If my client would have said, hey, if I would have known that, I would plead guilty.  I would have approached Mr. Erickson and said, hey, can we work this out?

At that point, as Mr. Carpenter had stated, everyone was in trial mode.  He never came to me and said, well, that's a game changer, let's see if we can do a deal here.  It was, you know, we were going to trial and that's what it was.

(Id. at pp. 40-42).

Then in response to cross-examination by State's Attorney Erickson, who was also the

original prosecutor, the following exchange took place with respect to the plea discussions:

Q    And we - - my notes here, I just want to verify with you, my plea offer was ten years to do straight time.  That's it.  That was the initial.  Does that seem right?

A    It could be.  Like I said, I couldn't find that in my file when I was flipping through, but I think that sounds right.  That's why he had wanted the additional offer of the five years straight time.  And that's when, like I say, on February 25th my notes reflect that we had you or had offered eight with three suspended for three.

Q    And let's start there.  Let's say assuming  - - well, we can assume pretty - -  I don't have my plea offer with me, I just have my notes.  But it says we can assume that the deal that you got on February 25th was less than what my original offer was?

A     Yes, sir.

Q    And he was susceptible - - in other words, he was at risk for more time and decided to reject the plea agreement that I had come down to?

A    That's correct.

13

Q      Do you remember during these discussions this deal with this Lori witness and other problems with the State's case being part of the discussion?

A      I remember when we were discussing it that Ms. Townsend, I know I had tried to track her down.  I believe you expressed that there was difficulty in getting her served because she was in a treatment facility, I believe in New York Mills, Minnesota.  But every time I tried to call her, she would not return a phone call.  She would not accept it.  And the treatment facility provider would not verify without a HIPAA release that she was in fact at that facility.  So I had troubles getting ahold of her.
And, quite frankly, I was concerned bringing her in because of the statement she'd given to law enforcement.  Had I called her, even if she would have admitted on the stand she had done it, with the impeachment material, I felt it best to keep that completely from the Jury.  That since the statement was given that night about him coming in and grabbing the lighter, I wanted to keep that as far form the Jury as I could.

Q      So a couple of weeks before trial, we're both left with direct witness, Ms. Townsend, that's in the wind, ineffectively [sic]?

A      Correct.

Q      So it's a try-able circumstantial case for your side?

A      I – that was my appraisal of it.

Q      We had no direct evidence, no direct witnesses of seeing him do it. He didn't admit to doing it, things of that nature?

A      That's correct.

Q      Here we sit a week or so before trial or two weeks before trial, roughly, and he could do the five years.  Right?

A      That was - -

Q      That's what you asked me to give you?

A      I had asked for five straight and you had come back said that there needed to be some period of probation with Mr. Carpenter's history to make sure he was able to re-acclimate to society.

Q      That was based on his alcohol problems his whole life?

A       I believe that was your - -

Q       So he rejected, though, the lesser deal than I had offered originally?

A       That's correct.

Q       Then when we got close to trial, and I think I fully admitted that we - - I think I filed the wrong habitual in a different case or something. I can't remember exactly, but you got notice a day or the day of trial or the day before trial of the habitual offender?

Q       I believe it was the day before. I want to say for some reason I remember the fax machine at 2:30, something like that, early afternoon. But I don't have the fax cover sheet or anything like that.

Q       That was litigated in the appeal, so I'm not too interested in that. I guess, what we need to put on notice is when we showed up there at pretrial, we're discussing that habitual notice before we went in before the Jury with the Court?

A       That's correct.

Q       Your client was present during that?

A       That's correct.

Q       Did he ask you to wait a second here, I want to change the ball game. This changes the ball game for me, I want to may not do this trial?

Q       No. And as Joe indicated in his testimony, we were both focused on the trial. And he did not approach me and ask further clarification of that.

Q       So he didn't ask at any time prior to that finding of guilt, anything about the habitual offender chances or anything like that?

A       I don't recall.

(Id. at pp. 49-53).

Finally, the court made the following inquiry:

THE COURT:     And from your recollection, Mr. Finck, you don't recall discussing the possibility of habitual offender with Mr. Carpenter?

THE WITNESS:    I don't. And I don't have any notes that I discussed it

15

with him in any detail. There was always this tenet, and as I said, I had gotten it from Mr. Carpenter because he had made a mention when I had just gotten the file from Ms. Weisz. He made mention to something about habitual offender, I believe, when I first started representing him. But it wasn't, what is habitual offender, can they get anything like that. It was just something that had been said to Ms. Weisz. But I don't have that documented. I'm just going up here [sic] of recollection, and I hate to assert that as a matter of fact.

(Id. at pp. 53-54).

### D. State district court's denial of Carpenter's ineffective assistance claim

The state district court made the following findings and conclusions relevant to Carpenter's

ineffective assistance claim relating to the habitual offender issue:

### FINDINGS OF FACT

1. Carpenter testified he was familiar with what habitual offender status would mean in Minnesota where most of his prior convictions are from.

2. Carpenter testified he overhead State's Attorney Erickson in a conversation with his first attorney, Lori Weisz, that he may file for habitual offender in this case.

3. Carpenter testified even though he had heard the State talk about filing for a special dangerous offender and knew what this would mean in Minnesota, he did not attempt to discuss the matter with his first attorney or Finck.

4. Carpenter knew the State had offered a sentence of (8) eight years with (3) suspended if a guilty plea. Carpenter had his attorney counter with (5) five years with (18) months to serve.

5. After a habitual offender enhancement notice was filed the day before trial, Carpenter asked on the day of trial about the (5) five year deal to serve and was informed by Finck the State had taken this offer off the table at this point.

* * * *

7. Carpenter testified if he had known what habitual offender included in North Dakota, it would have made a difference.

* * * *

10. Finck testified the initial offer from the State was for (10) ten years. This offer was reduced to the (8) eight year with (5) year to serve. Finck testified Carpenter rejected the (5) five year offer.

11. Finck stated he did not discuss habitual offender as the State had not filed and his experience until they filed it was not something to consider as the State often threatens to file.

12. After the habitual offender notice was filed and the trial was about to start, Carpenter asked about the (5) year deal and Finck informed him the State had withdrawn the offer.

## CONCLUSIONS OF LAW

The petitioner in a post-conviction relief motion for ineffective assistance of counsel must prove "(1) counsel's representation fell below an objective standard of reasonableness, and (2) the defendant was prejudiced by counsel's deficient performance." Flanagan v. State, 2006 ND 76.

* * * *

Carpenter's next allegation of ineffective assistance of counsel is he was not informed the State would seek habitual offender enhancement, the plea agreement was not on the table, and Carpenter did not know what the habitual offender statute could mean to any sentence he received.

Carpenter states if he had known about the habitual offender statute, this would have made a difference. Carpenter does not come out and say he would have entered a guilty plea and taken the initial deal offered, just that it would have made a difference. Carpenter rejected the State's offer of a (8) eight years with (3) three years suspended. Carpenter continued in his not guilty plea and proceeded to trial. In State v. Freed, 1999 ND 185 the Supreme Court stated:

> "Offense-enhancing or sentence-enhancing prior convictions ... must be alleged in the complaint or information or otherwise brought to the attention of a defendant if the State intends to use the prior convictions to enhance either the offense or the sentence upon a subsequent conviction." City of Fargo v. Bommersbach, 511 N.W.2d 563, 565 (N.D. 1994). Rule 11, N.D.R.Crim.P., "which provides a court may not accept a plea of guilty without first informing the defendant of any statutory mandatory minimum punishment, if any, for the offense ... does not specify such a requirement except for a plea of guilty." Id. "For a not guilty plea, due process does not require specific arraignment notification of a mandatory minimum sentence."

<u>Id.</u>

If by rule the Court is not required to advise a defendant of mandatory sentencing unless during a guilty plea, how can it be considered ineffective assistance of counsel to not have somehow foreseen the State would file for sentencing enhancement. Finck objected to the filing of the habitual offender notice, he objected to the short notice of the filing, and objected to the use of the late filed certified judgments used to enhance the sentence. Carpenter has not shown Finck's representation fellow below any reasonable threshold and Carpenter has not shown how the alleged ineffective assistance of counsel has prejudiced him. Prior to trial and the filing of habitual offender notice Carpenter faced up to (10) years in prison. Carpenter rejected a plea offer for a (5) year sentence of sentence of incarceration. Carpenter after trial and notice of the habitual offender faced up to (20) twenty years in prison. Carpenter availed himself of a trial forcing the State to prove the charge against him. Carpenter was given the opportunity to contest the prior convictions used to enhance his sentence under the habitual offender statute. Carpenter has not been prejudiced in any shape, manner, or form.

Carpenter has failed to carry the burden of his allegations of ineffective assistance of counsel. His petition is without merit and is ordered dismissed.

(Docket No. 27, Ex. 17, pp. 2-6).[2]

## E. <u>North Dakota Supreme Court's summary affirmance</u>

On July 18, 2013, the North Dakota Supreme Court summarily affirmed the denial of

Carpenter's post-conviction petition, stating:

PER CURIAM.

[¶ 1] Joseph Carpenter appeals from a district court order denying his application for post-conviction relief, arguing he received ineffective assistance of his trial counsel. The district court's order denying Carpenter's application for post-conviction relief is summarily affirmed under N.D.R.App.P. 35.1(a)(2).

<u>Carpenter III</u>, 2013 ND 115.

---

[2] Notably, no mention was made in the findings or conclusions that the same court had earlier concluded that counsel was aware the State might file the habitual offender notice based on the prosecutor's statements to that effect during the plea negotiations - a point later referenced in the North Dakota Supreme Court's decision on direct appeal. Perhaps, this was because no one asked Carpenter's counsel during the postconviction hearing whether the prosecutor had threatened filing a habitual offender notice during his plea negotiations or whether counsel's only awareness of this possibility came from what Carpenter had told him about what the prosecutor had said to his prior counsel following the preliminary hearing.

There are several points of note with respect to the North Dakota Supreme Court's decision. First, the decision was clearly on the merits given its reference to N.D.R. App. P. 35.1(a)(2), which reads in relevant part:

**Rule 35.1   Summary disposition**

(a)   **Affirmance by Summary Opinion.** In any case in which the court determines after argument, unless waived, that no reversible error of law appears and if:

* * * *

(2) the judgment of the district court is based on findings of fact that are not clearly erroneous;

* * * *

the court may affirm by an opinion citing this rule and indicating which one or more of the above criteria apply and citing any previous controlling appellate decision.

Second, based on the language of the Rule 35.1(a)(2), the North Dakota Supreme could have concluded that the judgment of the district court was not contrary to law without agreeing with the district court's legal reasoning. Cf. Dahl v. State, 2013 ND 25, ¶11, 826 N.W.2d 922 (affirming denial of petition for postconviction relief for reasons other than that given by the district court, stating: "we will not set aside the correct result merely because the district court's reasoning was incorrect, if the result is the same under the correct law and reasoning."). Given this possibility, it is impossible for this court to conclude what the ultimate legal reasoning of the North Dakota Supreme Court was for affirming the denial of Carpenter's ineffective assistance claim. In fact, while the state district court concluded that Carpenter failed to prove either of the two Strickland prongs, that may not necessarily have been the conclusion of the North Dakota Supreme Court.

Third, the same problem likely also exists for the facts found by the district court. All that

the North Dakota Supreme Court appears to have concluded under Rule 35.1(a)(2) is that there were sufficient not-clearly-erroneous facts found by the district court to support the judgment without necessarily agreeing with all of the district court's fact-finding. That particularly may have been true if the court based its affirmance upon legal reasons other than given by the district court.

### F. Carpenter's request for federal habeas relief

On December 13, 2013, Carpenter filed a *pro se* petition for habeas corpus relief with this court, averring that the State had failed to provide adequate notice prior to trial of its intent to seek a habitual offender enhancement, that he did not learn of the notice until the first day of trial, that his attorney told him he could not plead out to the charge, and that he was found guilty and sentenced as a habitual offender. On April 7, 2014, the undersigned issued an order directing Carpenter to submit an amended petition or otherwise show cause why his original petition should not be dismissed for failure to allege a violation the United States Constitution. (Docket No. 11).

On May 16, 2014, Carpenter filed an amended petition in which he asserted that his trial counsel was ineffective in violation of the Sixth and Fourteenth Amendments for the reasons discussed in more detail below. (Docket No. 15). On August 27, 2014, respondent filed a response to Carpenter's amended petition along with a motion to dismiss. (Docket Nos. 24 & 25). On September 3, 2014, the court received what is construed to be Carpenter's response.[3] (Docket No. 28).

## II. GOVERNING LAW

Under 28 U.S.C. § 2254, a federal court may review state court criminal proceedings to determine whether a person is being held in violation of the United States Constitution or other

---

[3] The "response" was a one-page letter in which Carpenter directed the court's attention to exhibits he believed lent support to his claim of ineffective assistance of counsel. (Docket No. 28).

federal law. This review is limited because, as a matter of federalism and comity, state courts have the primary responsibility of ensuring compliance with federal law in state criminal proceeding. Consequently, federal court intervention is limited to instances in which a person is being held in custody pursuant to a state court decision that (1) under § 2254(d)(1) is directly contrary to established federal law as enunciated by the United States Supreme Court or is an objectively unreasonable application of prior Supreme Court precedent, or (2) under § 2254(d)(2) is based on an unreasonable determination of the facts based on the evidence presented in the state court proceeding. E.g., Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 786, 788 (2011) ("Richter").

When a petitioner is claiming ineffective assistance of counsel, Strickland v. Washington, 466 U.S. 668 (1984) ("Strickland") requires that the petitioner demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the petitioner. The test for deficient performance under the "first Strickland prong" is whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Id. at 688; Richter, 131 S.Ct. at 787.

Under the "second Strickland prong," prejudice is only shown when "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Richter, 131 S.Ct. at 787 (quoting Strickland, 466 U.S. at 694) (emphasis added).

The petitioner bears the burden of establishing that he is entitled to habeas relief. Id. at 787-88. This burden is difficult to meet since state court decisions are reviewed under the "highly deferential standard" of § 2254(d). Id. And, for claims of ineffective assistance, the bar is even higher in that courts are required to review such claims under the "doubly deferential" standard of taking "a highly deferential look at counsel''s performance" as required by Strickland through the

"deferential lens of § 2254(d)." <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S.Ct. 1388, 1403 (2011) (internal quotations and citations omitted).

## III.    **CARPENTER'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL**

### A.    **Carpenter's ineffective assistance claim**

In his amended § 2254 petition, Carpenter presents a single claim of ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments that he describes as follows:

> The day of my trial my attorney, I, the prosecutor and the judge met in the dining room kitchen of the city hall basement because the court house had a bat problem. I was told then by my attorney (Travis Finck) that the state had filed a habitual offender on me. He admitted in my post-conviction hearing that he didn't know what was going on and was caught up in the trial and didn't advice [sic] me of what to do, what my options were. He (Travis Finck) admitted ineffective counsel.

(Docket No. 15, p. 5).

It appears from this description that Carpenter's allegation of ineffective assistance focuses upon what he believes counsel failed to do on the morning of the trial and not earlier in the plea bargaining process.   And, while Carpenter is now proceeding *pro se*, this is consistent with the sole issue that Carpenter raised in his appeal to the North Dakota Supreme Court from the denial of his petition for postconviction relief, where he was represented by counsel.   In his state postconviction appellate brief, Carpenter identified the sole issue to be the following:

> [¶] Whether the trial court's denial of Defendant's Petition for Post-Conviction Relief on the grounds of ineffective assistance of counsel was an abuse of discretion and clearly erroneous, where a plea agreement had been previously presented and rejected prior to trial, the prosecutor filed a motion to enhance the defendant's sentence as a habitual offender the day immediately prior to trial which was subsequently appealed, reversed, and remanded on a previous appeal for lack of timeliness; the defendant's attorney did not inquire whether the previous plea offer was still open; did not advise the defendant regarding the import about how a motion to enhance sentence might impact the defendant; did not ascertain that the plea offer was still open; and the defendant instead went to trial, was convicted, and given an enhanced sentence.

22

(Docket No. 27, Ex. 19, pp. 2-3). Further, the arguments made in his state appeal brief in support of this issue were similarly confined. (Id. at pp. 6-10).[4]

Finally, Carpenter's petition here is somewhat ambiguous in terms of what he is contending his counsel should have done on the morning of the trial. The same was true for his state appellate

---

[4] This is not to suggest that Carpenter would have a valid claim with respect to what occurred earlier. Even assuming the prosecutor had been threatening his counsel with the filing of the habitual offender notice during the plea negotiations and this had not been explicitly conveyed to Carpenter, there is evidence supporting the conclusions that: (1) counsel believed Carpenter was generally aware of the possibility that the prosecutor might seek a habitual offender designation because Carpenter told him about his having overheard the prosecutor's statement to that effect to his prior attorney; (2) Carpenter generally understood that such a designation could lead to a sentence greater than the maximum based on his prior Minnesota experience, even if he did not fully understand North Dakota's law; and (3) Carpenter and his counsel were essentially playing a game of "chicken," hoping that, when they rejected the State's last plea offer and countered with something less, the State would come back with another offer more favorable than the last, particularly with the evidence suggesting that the prosecutor was concerned about the circumstantial nature of his case. But, of course, the State did not come back with a better deal.

Also, when the State made its last offer approximately two weeks prior to trial, counsel may have concluded it was unlikely at that point the habitual offender notice was going to be filed since, in his experience, the prosecution would have filed it before that time. Also, he may have believed that, even if it was filed after Carpenter rejected the last offer, it could still be dealt with in terms of further bargaining under the assumption the notice would be filed within a reasonable time before trial and not the afternoon of the day prior to trial.

In short, there is evidence that Carpenter generally understood there was a possibility of his being designated a habitual offender when he rejected the last plea offer (and that his counsel believed Carpenter was aware of the possibility) and that counsel could not have reasonably foreseen that the State would not file the habitual offender notice until the day prior to trial, much less that the trial court would allow such a late filing or that the North Dakota Supreme Court would later allow the State a "do over."

As the Supreme Court has explained in recent cases, demonstrating that counsel was ineffective during plea negotiations is a difficult task in part because:

> The art of negotiation is at least as nuanced as the art of trial advocacy and it presents questions farther removed from immediate judicial supervision. There are, moreover, special difficulties in evaluating the basis for counsel's judgment: An attorney often has insights borne of past dealings with the same prosecutor or court, and the record at the pretrial stage is never as full as it is after a trial. In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel.

Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 741 (2011).

> Bargaining is, by its nature, defined to a substantial degree by personal style. The alternative courses and tactics in negotiation are so individual that it may be neither prudent nor practicable to try to elaborate or define detailed standards for the proper discharge of defense counsel's participation in the process.

Missouri v. Frye, __ U.S. __, 132 S.Ct. 1399, 1408 (2012). Also, the fact that an excellent or even good attorney may have performed differently is not the test. See Nichols v. United States, 563 F.3d 240, 248 (6th Cir. 2009). Rather, counsel is only deemed ineffective when his or her performance falls outside the "wide range of reasonable professional judgment." E.g., Forrest v. Steel, 764 F.3d 848, 853 (8th Cir. 2014). Finally, as pointed out in Frye, a defendant has no right to be offered a plea deal. 132 S.Ct. at 1410.

It may very well have been for these reasons that Carpenter's postconviction appellate counsel focused his attack on what trial counsel did not do on the morning of the trial in light of the filing of the habitual offender notice the day prior.

brief.  A generous reading of his current petition, however, is that he is contending that his counsel

should have done two things after telling him about the habitual offender notice and his asking

whether he could still plead:  (1) counsel should have affirmatively inquired of the prosecution as

to whether its last plea offer was still available and (2) counsel should have discussed with him and

explored what other alternatives might have been available.

### B.      The North Dakota Supreme Court could have reasonably concluded Carpenter failed to demonstrate prejudice

In determining whether the state court properly applied Strickland, this court is not limited

to the explicit reasoning of the state court or the fact that no reasons may have been given.  Rather,

the court must "must determine what arguments or theories supported or . . . could have supported,

the state court's decision." Richter, 131 S.Ct. 770 at 786; see also Williams v. Roper, 695 F.3d 825,

834–37 (8th Cir. 2012) ("Williams").  If necessary, this requires consideration of both Strickland

prongs, even if it is unclear from the state court's decision whether one or both were addressed. See

Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 740 (2011); ("Moore").[5]  In this case, the focus will be

---

[5] There does not appear to be any need to "look through" the North Dakota Supreme Court's summary affirmance to critically examine the reasoning of the state district court in order to apply § 2254(d)(1) as may have been suggested by earlier pre-Richter Eighth Circuit precedent, e.g., Worthington v. Roper, 631 F.3d 487, 497-502 (8th Cir. 2011), except, perhaps, to the extent the district court's discussion may be helpful in considering what reasons or theories the North Dakota Supreme Court could have relied upon in denying Carpenter's Strickland claim. See Hittson v. GDCP Warden, 759 F.3d 1210, 1233 n.25 (11th Cir. 2014); Williams, supra. That being said, several of the reasons that the district court may have relied on to reject Carpenter's Strickland claim are questionable.

For example, the district court appears to have concluded that Carpenter did not have a right to effective assistance with respect to advice about his being a habitual offender because the court was not required to give notice of the possibility of an enhanced sentence at the time of arraignment.  This is a non sequitur.  See, e.g., Frye, 132 S.Ct. at 1405-08 (observing that, with well over 90% of all state and federal criminal cases being resolved by plea, "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant"); Padilla v. Kentucky, 559 U.S. 356, 373(2010) ("In sum, we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel."); Barnes v. Hammer, 765 F.3d 810, 814 (8th Cir. 2014) ("If a defendant turns down a legitimate plea offer due to incompetent advice, and is later convicted on more serious counts after trial and receives a more severe sentence, his claim for ineffective assistance of counsel will be successful."); Cardoza v. Rock, 731 F.3d 169, 180 (2d Cir. 2013) ("The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal case.... [C]ounsel may and must give the client the benefit of counsel's professional advice on this crucial decision.") (internal quotations and citing authority omitted).  A counsel's obligation to advise a defendant what he or she may be

on the prejudice prong since that is determinative.

Starting first with Carpenter's contention that his counsel should affirmatively have inquired of the prosecutor whether the State's last plea offer was still available, to prove <u>Strickland</u> prejudice Carpenter would have been required to demonstrate a *reasonable probability* that (1) the State would have been willing to make available its prior plea offer; (2) Carpenter would have been willing to accept the offer; and (3) that the trial court would have accepted the plea agreement.[6] <u>See</u>, <u>e.g.</u>, <u>Missouri v. Frye</u>, __ U.S. __, 132 S.Ct. 1399, 1409 (2012); <u>see</u> <u>Barnes v. Hammer</u>, 755 F.3d 810, 814 (8th Cir. 2014) ("<u>Barnes</u>"). And here, the North Dakota Supreme could have concluded that Carpenter failed to offer anything more than speculation that the prosecution would have been willing to renew its prior offer and this was not enough to satisfy the "reasonable probability" standard of <u>Strickland</u>.

---

facing is different from and goes beyond the minimum requirements established by the criminal rules of procedure to help insure that due process satisfied. <u>See</u> <u>United States v. Day</u>, 969 F.2d 39, 43-44 & n.4 (3d Cir. 1992); <u>cf.</u>, <u>United States v. Lewis</u>, 477 F. App'x 79 (4th Cir. 2012). Notably, nowhere in <u>Padilla</u> did the Supreme Court suggest that the defendant's right in that case to effective assistance with regard to the consequences of a conviction upon his immigration status was dependent upon what the court was required to advise the defendant, either at the time of arraignment or later at the time of taking the guilty plea.

The district court may also have concluded that, since Carpenter rejected the prosecution's last plea offer and went to trial, this foreclosed any claim of ineffective assistance under the Sixth Amendment. If so, this was directly contrary to the Supreme Court's decision earlier that year in <u>Lafler v. Cooper</u>, where the Court explicitly rejected the argument that "[a] fair trial wipes clean any deficient performance by defense counsel during plea bargaining." 132 S.Ct. 1376, 1388.

The district court also pointed to counsel's other satisfactory performance. In so doing, the court may not have considered the possibility that a single gross act of ineffective assistance bearing upon the decision of whether to plead guilty or go to trial could be enough to violate the Sixth Amendment and <u>Strickland</u>, such as appears to have been the case in <u>Frye</u> and <u>Padilla</u>. Also, the Supreme Court in <u>Lafler</u> characterized the state court's discussion of counsel's performance at trial as an irrelevant observation with respect to the defendant's claim of ineffectiveness for failing to have passed on a plea offer made by the state in that case. 132 S.Ct. at 1390.

Finally, there is reason to question what may have been the court's conclusion that Carpenter failed to demonstrate prejudice because he purportedly stopped short of explicitly stating during his postconviction hearing that he would have taken the State's last plea offer. This point is addressed in more detail in footnote 7 *infra*.

[6] N.D. R. Crim. P. 11, like its federal counterpart, provides for both binding plea agreements (which the court can reject but must allow the defendant to withdraw from if rejected) and non-binding agreements. The record in this case contains no specific mention of whether the State's last plea offer was binding or only a recommendation as to the disposition. However, it will be presumed from the context of what was being discussed that the plea offer fell into the former category.

Examining the state court record, there is support for such a conclusion. Counsel testified that it was his recollection the prior plea offer was off the table. And, while because of the passage of time (more than 2½ years) counsel could not recall exactly why he believed that to be the case (suggesting it could have been because his client had rejected the offer by making a counteroffer, the prosecutor having affirmatively stated the offer was good only up to trial, or simply his experience with the prosecutor), Carpenter has offered nothing to call this testimony into question, much less affirmatively demonstrate that the State's last plea offer could still be had. For example, there is no evidence that the prosecutor was still willing to deal, *e.g.*, the prosecutor making another overture in the last few days leading up to the commencement of the trial or on the morning of the trial after having filed the habitual offender notice. Further, prosecutors commonly condition plea offers upon timely acceptance so that the State can avoid the time and expense of having to prepare for trial, securing the attendance of witnesses, and assembling a jury pool.

If the North Dakota Supreme Court could have reasonably concluded that Carpenter failed to demonstrate a reasonable probability that the prosecutor would have been willing to strike a plea deal along the lines of its last offer, then Carpenter's first argument of ineffectiveness fails and the court need not consider whether there was a reasonable probability that Carpenter would have accepted such a deal on the morning of the trial[7] and that the court would not have rejected it.[8]

---

[7] The state district court in its findings and conclusions states that Carpenter stopped short in his postconviction testimony of saying he would have taken the State's last plea, finding that he only testified it would have made a difference in his decision-making. In making this statement, it appears the district court focused primarily upon the question and answer,

Q     And do you believe that if you had been fully informed of the sentence potential, sentencing consequences that this would have made a difference in your decision-making.
A     Yes, sir.

(Doc. No. 27, Ex. 16, pp. 6-17), and gave short shrift to other parts of his testimony, including the question and answer immediately preceding, as set forth earlier. Further, there are other things which suggest that any determination by the district court that Carpenter failed to demonstrate a reasonable probability he would have taken the State's last plea offer on the morning of the trial, may have been unreasonable. More particularly, there was the district court's finding that Carpenter specifically asked his attorney whether he could plead to the State's last offer after being advised the habitual

Carpenter's second argument of ineffectiveness is that counsel did not discuss with him possible options in light of the filing of the habitual offender notice before proceeding with the trial. While Carpenter is not specific as to what those options were, presumably one would have been to explore whether there was some middle ground in light of the change of circumstance with the filing of the habitual offender notice, *e.g.*, the prosecutor agreeing not to pursue the habitual offender designation <u>and</u> Carpenter taking the best deal the prosecutor was then willing to offer or entering an open plea, if the prosecutor was not willing to offer something more favorable, thereby limiting his maximum exposure to ten years.[9]

---

offender notice had been filed. There would have been no reason for him to ask at that point if he was not serious, and it appears the only reason he did not pursue this further was because his counsel told him the plea deal was no longer available. In addition, Carpenter's counsel acknowledged in his testimony that Carpenter had advised him early in the plea bargaining process that he (Carpenter) did not believe he could stand to serve ten years and was interested in a plea deal for less time. Moreover, Carpenter had already gone beyond expressing a possible interest in admitting guilt and entering a plea; he had made counteroffers to plead guilty. Finally, with the filing of the habitual offender notice, there was a substantial disparity between the State's last plea offer and the maximum sentence of twenty years that Carpenter faced if he was demonstrated to be a habitual offender. The existence of a substantial disparity is one of the factors that courts rely upon in these types of cases to assess the probability that a criminal defendant would have taken a plea offer as discussed by the Sixth Circuit in <u>Cooper v. Lafler</u>, 376 Fed.Appx. 563, 571-73 (6th Cir. 2010) (citing other cases). And, while the Supreme Court reversed on other grounds in <u>Lafler v. Cooper</u>, __ U.S. __, 132 S.Ct. 1376 (2012), the Court explicitly adopted the Sixth Circuit's conclusion that prejudice had been demonstrated by citing to its opinion. 132 S.Ct. at 1391.

Nevertheless, even if the state district court did unreasonably conclude that Carpenter had not demonstrated a reasonable probability he would have taken the State's last offer and this conclusion was based all or in substantial part upon an unreasonable finding of fact, this does not trigger review under § 2254(d)(2) since, as discussed earlier, there is no indication the North Dakota Supreme Court relied upon this or any other particular factual determination made by the state district court. Moreover, as discussed above, there are the arguments the North Dakota Supreme Court could have relied upon to conclude that <u>Strickland</u> prejudice was not demonstrated, even if it believed Carpenter had established a reasonable probability he would have pled guilty to the State's last plea offer on the morning of the trial had it been available. <u>See</u> <u>Byrd v. Workman</u>, 654 F.3d 1195, (10th Cir. 2011) (unreasonable factual determination must have been material to the ultimate decision before § 2254(d)(2) is satisfied); <u>Collier v. Norris</u>, 485 F.3d 415, 423 (8th Cir. 2007).

[8] The State argues that the North Dakota Supreme Court could have reasonably concluded that there was insufficient evidence the district court would have accepted a plea agreement on the morning of the trial along the lines of the State's last offer. That may be, but the state postconviction judge was also the trial and sentencing judge and he did not state in his opinion denying Carpenter's claim of ineffective assistance that he would not have accepted a plea deal along the lines of the State's last plea offer, which, as noted earlier, was eight years with five years to serve and three years suspended for three years.

[9] It is not clear under N.D.C.C. § 12.1-32-09 whether it is possible to "unring the bell" if the prosecution changes its mind about seeking a habitual offender determination after having filed the notice or whether the court could

For many of the same reasons, however, the North Dakota Supreme Court could have concluded that Carpenter offered nothing more than speculation that the prosecutor would have been willing at that point not to pursue a habitual offender designation, much less enter into a plea agreement for something less than the ten-year statutory maximum. Further, and more significantly, the court could have concluded it was mere speculation that Carpenter may have actually gone along with this option, instead of going to trial. In particular, the court could have relied upon: (1) the fact that the only sentence Carpenter explicitly suggested he would have taken was the last plea offer from the prosecution, which he had earlier rejected, albeit before the habitual offender notice was filed; (2) the evidence that, when counsel told Carpenter the last plea offer was no longer available, Carpenter did not ask his counsel to explore another alternative; (3) counsel's testimony that Carpenter had indicated to him earlier that he did not feel he could do ten years; and (4) the evidence suggesting that Carpenter and his attorney were willing to "roll the dice" because of the circumstantial nature of the State's case.

As the Eighth Circuit recently explained in <u>Williams</u>:

> Taken together, AEDPA and <u>Strickland</u> establish a 'doubly deferential standard' of review. <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S.Ct. 1388, 1410, 179 L.Ed.2d 557 (2011) (internal quotation omitted). First, under <u>Strickland</u>, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome . . . , focusing on whether it is 'reasonably likely' that the result would have been different absent the errors. <u>Strickland</u>, 466 U.S. at 696, 104 S .Ct.2052. The <u>Strickland</u> prejudice standard is less demanding than a more-probable-than-not standard, but the difference is 'slight and matters only in the rarest case.' <u>Harrington v. Richter</u>, ⸺ U.S. ⸺, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011) (internal quotation omitted). To satisfy <u>Strickland</u>, the likelihood of a different result must be 'substantial, not just conceivable.' <u>Id.</u> Under AEDPA, we must then give substantial deference to the state court's predictive judgment. So long

proceed to sentence a defendant as a habitual offender, irrespective of the changed wishes of the prosecution, by relying upon whatever information accompanied the filing of the notice as well as what have turned up in a presentence investigation. That being said, it seems unlikely a court would proceed on its own - particularly, in this case with the prosecution having filed its notice so late and the questions that inevitably would be arise on appeal.

> as the state court's decision was not 'contrary to' clearly established law, the remaining question under the 'unreasonable application' clause of § 2254(d) is whether the state court's determination under the <u>Strickland</u> standard is unreasonable, not merely whether it is incorrect. <u>Id.</u> at 785. This standard was meant to be difficult to meet, and ' even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.' <u>Id.</u> at 786.

695 F.3d at 831–32 (emphasis added). Applying these deferential standards, it cannot be said that any conclusion by the North Dakota Supreme Court that Carpenter failed to demonstrate prejudice was an unreasonable application of <u>Strickland</u>. <u>Cf.</u> <u>White v. Dingle</u>, 757 F.3d 750, 755 (8th Cir. 2014) (mere speculation not enough to demonstrate <u>Strickland</u> prejudice); <u>Covington v. United States</u>, 739 F.3d 1087, 1091 (8th Cir. 2014) (federal defendant failed to satisfy the prejudice prong of <u>Strickland</u> because he could not demonstrate how the government would have proceeded with respect to the breach of the plea agreement that would have resulted if defendant's attorney had objected to certain sentencing guidelines treatment); <u>Barnes</u>, 653 F.3d at 814-15 (deciding in part that the Minnesota courts reasonably applied <u>Strickland</u> in concluding the defendant did not suffer prejudice as result of alleged ineffective assistance during plea negotiations because the record reflected that he rejected the plea offer in question for other reasons).

## IV.    CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. When the court has rejected a petitioner's claim on the merits, the substantial showing required is that the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)); <u>see also</u>, <u>United States v. Lambros</u>, 404 F.3d 1034, 1036 -1037 (8th Cir. 2005); <u>Garrett v. United States</u>, 211 F.3d 1075, 1076-77 (8th Cir. 2000).

In this case, reasonable jurists would not find debatable the conclusion that the North Dakota Supreme Court's denial of Carpenter's ineffective assistance claim was reasonable given the degree of deference that must be accorded its decision under <u>Strickland</u> and § 2254(d).

## V. RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS**:

1. Respondent's motion to dismiss (Doc. No. 25) be **GRANTED** and Carpenter's original and amended petitions for habeas corpus relief (Docket Nos. 1 and 15) be **DENIED** with prejudice;

2. A certificate of appealability not be issued; and

3. The court certify that an appeal from the denial of this action may not be taken *in forma pauperis* because such an appeal would not be in good faith absent a certificate of appealability.

<b><u>NOTICE OF RIGHT TO FILE OBJECTIONS</u></b>

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 12th day of February, 2015.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court